No. 17,026.

## Henderson, Auditor of State, *v.* The State, ex rel., Stout, Sheriff of Vigo County.

Constitutional Law.—*Fees and Salaries.—Act of 1891.— County Sheriffs.— When Constitutional Question will not be Decided.*—The act of March the 9th, 1891, fixing the compensation and prescribing the duties of certain State and county officers, etc., is not unconstitutional as to county sheriffs, and since the act may be void as to other officers, viz., county auditors, county treasurers and county recorders, and yet stand as to county sheriffs, there being no connection whatever, so far as his official duties are concerned, between a county sheriff and such other officers, a sheriff will not be permitted to litigate the constitutionality of the law in relation to such other officers, for courts will pass upon a constitutional question only when it is necessary to a decision of the cause upon its merits.

Same.—*Fees and Salaries.—Subject Matter of Act.— Title.—Act of 1891.* —Such act is not void as embracing more than one subject. The compensation of the State's public servants, whether their services be rendered for the State at large or for a county or township, embraces a single, general subject which may be embraced in a single act of the General Assembly.

Same.—*Fees and Salaries.— Taxing and Collecting Fees for Officers' Funds.*—The provision of the act requiring officers to tax and collect fees for the purpose of creating funds with which they may be paid is properly connected with the subject of compensating such officers for their public services, as well as the provision fixing the fees to be taxed and collected.

Same.—*Fees and Salaries.— Tax on Litigation.—Administration of Justice Without Purchase.*—Such act does not violate section 12, article 1, of the constitution, in that the fees taxed under it are a tax upon litigation. It is a matter of no concern to a litigant whether the sheriff who serves his writs is paid by him directly or whether he receives his pay from the county treasurer, provided the amount paid by him is the same in either case.

Same.—*Fees and Salaries.—Act Special and Local.*—The act above referred to is not unconstitutional as being special and local, in that it does not include in its provisions persons who were elected to office prior to the time it took effect.

Dissenting opinion by McCabe, J.

From the Marion Circuit Court.

*A. G. Smith*, Attorney-General, *F. H. Blackledge* and *W. W. Thornton*, for appellant.

*B. K. Elliott* , *W. F. Elliott, J. W. Kern, A. C. Ayres, A. Q. Jones, J. E. Lamb* and *J. T. Beasley*, for appellee.

COFFEY, J.—On the 25th day of April, 1893, the appellee filed a petition in the Marion Circuit Court, the purpose of which was to compel the appellant, as State auditor, to draw a warrant on the State treasurer in favor of the relator, as sheriff of Vigo county, as compensation for the delivery of convicts at the Southern State prison.

It is alleged in the petition, among other things, that the relator is the sheriff of Vigo county, having been elected to that office at the November election, in the year 1892; that in the year 1892 and in the year 1893, as such sheriff, he conveyed from Vigo county to the State prison south, and delivered to the warden, a given number of convicts, convicted and sentenced in the Vigo Circuit Court; that he was entitled to receive as mileage for the performance of such duty the sum of fifteen cents for each mile traveled, going and returning, for each convict conveyed to the prison, except when more than one was taken at the same time, to be paid out of the general funds in the State treasury; that there is in the general fund in the treasurer's office far more than sufficient to pay the relator's claim; that on the 21st day of April, 1893, the relator demanded of the appellant, who then was, and still is, the auditor of State of the State of Indiana; that he draw a warrant on the treasurer of State for the sum due him, to which demand the appellant refused to accede, putting such refusal upon the sole ground that the relator was not entitled to any warrant whatsoever, because the act of the General Assembly of the State, entitled "An act fixing the compensation and

prescribing the duties of certain State and county officers, and providing penalties for the violation of its provisions,'' passed notwithstanding the objections of the Governor thereto, March 9, 1891, p. 424, does not allow the sheriffs of the State to receive mileage for such services; that the claim of the appellant that the act of March 9, 1891, *supra*, precludes the relator from receiving the mileage claimed by him is wholly and totally unfounded in this, that the act is in conflict with the provisions of the constitution of the State and is utterly void.

To this petition, and to the alternative writ of *mandamus* issued thereon, the circuit court overruled a demurrer, and, the appellant failing and refusing to answer further, a peremptory writ was ordered, from which action and judgment of the court this appeal is prosecuted.

The assignment of error calls in question the propriety of this ruling.

On the 9th day of March, 1891, the General Assembly of the State, notwithstanding the Governor's objections thereto, passed an act entitled ''An act fixing the compensation and prescribing the duties of certain State and county officers, and providing penalties for the violation of its provisions.''

The act purports to fix the compensation of the Governor of the State, Lieutenant-Governor, secretary of State, auditor of State, treasurer of State, attorney-general, State librarian, clerk of the Supreme Court and his deputies and assistants, including his stenographer and type-writer; superintendent of public instruction, director of the department of geology and natural resources, inspector of mines, chief of bureau of statistics, inspector of mineral oils, secretary of the State board of health, judges of the Supreme Court, law librarian of the Supreme Court, sheriff of the Supreme Court, judges

of the circuit courts of the State, judges of the superior courts, judges of the criminal courts, prosecuting attorneys, county auditors, county treasurers, county recorders, clerks of the circuit courts and sheriffs of the several counties of the State.

It requires certain State officers to tax the fees therein fixed, and pay the same into the State treasury. It also requires the clerks of the circuit courts and the sheriffs of the several counties to tax the fees therein specified against litigants in court, and pay the same into the county treasury.

The twenty-first section of the act is as follows: "The county officers in this act named shall be entitled to receive for their services the compensation specified in this act, which compensation is graded in proportion to the population and the necessary services required in each of said several counties, subject to the conditions herein prescribed, and they shall receive no other compensation whatever."

Section one hundred and twenty-three provides that the sheriffs of the several counties of the State shall, on behalf of their respective counties, tax and charge the fees provided by law on account of services performed by such officers; the fees and amounts so charged shall be designated "sheriff's costs," but they shall in no sense belong to or be the property of the sheriff, but shall belong to, and be the property of, the county. This section further provides that, in addition to his salary, the sheriff shall be allowed his actual traveling expenses for taking each convict to the State prison, to be paid out of the State treasury upon the certificate of the warden of the prison, accompanied by an itemized statement of such expenses, verified by the affidavit of the sheriff.

The act undertakes to compensate county clerks, sheriffs, auditors, treasurers and recorders, by a fixed salary

payable quarterly out of the county treasury from funds to be known respectively as "clerk's fund," "auditor's fund," "treasurer's fund," "sheriff's fund" and "recorder's fund." The clerks, sheriffs and recorders can not draw from the treasury, on account of salaries, a sum in excess of the fees taxed, collected and paid in by each of them prior to the payment of their respective salaries.

Section one hundred and thirty-six of the act is as follows: "Where any clerk, auditor, recorder, treasurer or sheriff has been elected by the people of his county, before the taking effect of this act, such officer so elected, during the time that he holds such term, shall not be subject to the provisions of this act. He shall hold such term of office, and perform the duties thereof, and receive the compensation prescribed by law the same as if this act had not been passed."

The pleadings, including the assignment of error, in this case, are in such form as to present for our consideration and decision the question as to whether this enactment is a valid law under the constitution of the State.

In passing upon and deciding the numerous intricate and important questions presented in this case by the learned counsel who have so ably briefed and argued them, it is important that we should constantly keep in mind the oft repeated declaration and rule that the power to declare a statute unconstitutional is a high one, and will never be exercised in doubtful cases. To doubt the constitutionality of a law, is to resolve in favor of its validity. An act of the Legislature is not to be declared unconstitutional unless it is clearly, palpably and plainly in conflict with the constitution. It is well to keep in mind, also, the well known rule that courts will pass upon such constitutional questions only as are necessary to a decision of the cause upon its merits. *Brown* **v.**

*Buzan,* 24 Ind. 194; *Anderson* v. *Caldwell,* 91 Ind. 451; *State, ex rel.,* v. *Insurance Co., etc.,* 115 Ind. 257; *State, ex rel.,* v. *Denny, Mayor,* 118 Ind. 382; *Parker* v. *State, ex rel.,* 133 Ind. 178.

Against the validity of the law, it is contended by the appellee:

*First.* That it violates section 19, article 4, of the State constitution, which declares that "every act shall embrace but one subject and matters properly connected therewith; which subject shall be expressed in the title."

*Second.* That it violates section 12, article 1, of the constitution, which requires that "Justice shall be administered freely and without purchase; completely, and without denial; speedily, and without delay."

*Third.* That it violates section 22, article 4, of the constitution of the State, which provides that "the General Assembly shall not pass local or special laws   *   * in relation to fees or salaries; except that the laws may be so made as to grade the compensation of officers in proportion to the population and the necessary services required."

*Fourth.* That it violates section 23, article 4, of the constitution, which provides that "In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State."

The constitutional provision set out in the first objection to the law under immediate consideration, has often been before this court for construction and application.

It has been repeatedly declared that the purpose of this provision is:

*First.* To prevent the passage of an act under a false and delusive title which did not indicate the subject-

matter contained in the act, whereby legislators might be deceived into the support of measures, in ignorance of their true character.

*Second.* To prevent the combining together, in one act, of two or more subjects having no relation to each other, whereby members, in order to procure such legislation as they wished, were often constrained to assist in passing other measures obnoxious to them. *Hingle* v. *State*, 24 Ind. 28.

It has been truthfully said that this provision has been the source of much perplexity, both in the Legislature and in the courts. The proper construction of its provisions was announced, we think, in the case of *Bright* v. *McCullough*, 27 Ind. 223, where it was said by this court: "The constitution does not assume to divide the general scope of legislation, and classify the parts under particular heads or subjects, but, of necessity, has left that power to be exercised by the Legislature, as it, in its wisdom and discretion, shall deem proper. The constitution assumes that different subjects of legislation do exist, and requires that each act shall embrace but one subject and matters properly connected therewith, which subject shall be expressed in the title. The purposes of the provision, in view of the evils intended to be guarded against, can only be effected by requiring that the subject expressed should be reasonably specific, or, in other words, should be such as to indicate some particular branch of legislation, as a head under which the particular provisions of the act might reasonably be looked for. * * * But it should be borne in mind that the constitution only requires that a proper subject of legislation should be expressed in the title, and not the particular features or details of the law. If these relate to the subject expressed, it satisfies the constitutional provisions. The words, 'An act concerning highways,'

would express but a single subject, and yet would constitute a comprehensive title, under which almost any desired provision relating to highways might be enacted.''

It has been often decided that the title of an act need not go into details, and that it is sufficient if it indicates with reasonable precision and clearness the subject it embraces. Nor is an act invalid because it includes details not mentioned in the title, if the details are germane to the general subject designated in the title. If the subject is properly designated in the title to an act of the General Assembly, any legislation properly connected with the subject may be enacted, though there be no mention in the title, of such details. In other words, it is always necessary to designate in the title of an act the subject of legislation, but it is never necessary to mention the matters properly connected with the subject. *Warren* v. *Britton,* 84 Ind. 14; *Bitters* v. *Board, etc.,* 81 Ind. 125; *Benson, Admr.,* v. *Christian,* 129 Ind. 535; *Farrell* v. *State,* 45 Ind. 371; *Thomasson* v. *State,* 15 Ind. 449; *Reams* v. *State,* 23 Ind. 111; *Hingle* v. *State, supra; State* v. *Sullivan,* 74 Ind. 121.

It is contended by the appellee, that this act embraces a multiplicity of subjects, and that it is for that reason void. It is contended that it embraces the following subjects, namely: (1) County officers, (2) State officers, (3) judicial officers, (4) the duties of officers, (5) compensation of officers, (6) public revenues, (7) fees, (8) salaries, and that each of these are separate and distinct subjects wholly disconnected.

We are unable to agree with the appellee in this contention. Some of the matters mentioned as subjects are matters properly connected with the subject designated in the title, while others are simply divisions of that subject. The subject of legislation, as designated in the

title of this act, is the compensation of certain State and county officers. It is no uncommon thing in legislation to prescribe the duties of public officers in the same act which fixes their compensation. Nor is it uncommon in this State to fix in one general law the compensation of public officers belonging to different classes. Such was the fee and salary law of 1879 (Acts 1879, p. 130), which fixed the fees and salaries of the State officers, and the fees of county and township officers.

Of like character was the act of 1852, R. S. 1852, p. 433.

To the same effect was the fee and salary law of 1859, Acts 1859, p. 174.

The same practice was followed by the General Assembly, in enacting the fee and salary law of 1865. Acts of 1865, p. 128. The same course was pursued in 1875, Acts of 1875, p. 31.

Nor are we able to perceive any valid objection to such a course. The title of the act in such cases is sufficiently comprehensive and specific to call every legislator's attention to the subject under consideration. The compensation of the State's public servants, for services rendered, whether such services be rendered for the people of the State at large or for the people of a single county or township, embraces, we think, but a single general subject which may be embraced in a single act of the General Assembly.

To hold otherwise is to affirm that the public officers of the State have been compensated for their services under void legislation since 1852. We can not give our assent to such a contention.

We are unable to perceive any reason which could be urged against such an act, which would not apply also to a single act fixing the fees and salaries of the State

officers because the State is divided into three separate and distinct departments.

We think that a provision requiring officers to tax and collect fees for the purpose of creating a fund with which they may be paid, is properly connected with the subject of compensating such officers for their public services, as well as a provision fixing the fees to be taxed and collected. *Bitters* v. *Board, etc., supra; Walker* v. *Dunham,* 17 Ind. 483; *Bank of the State* v. *City of New Albany,* 11 Ind. 139; *State* v. *Sullivan, supra; City of Indianapolis* v. *Huegele,* 115 Ind. 581; *Reed* v. *State,* 12 Ind. 641; *Brandon* v. *State,* 16 Ind. 197; *Robinson* v. *Skipworth,* 23 Ind. 311; *Hunter* v. *Burnsville, etc., Co.,* 56 Ind. 213; *Gillespie* v. *State,* 9 Ind. 380; *State, ex rel.,* v. *Board, etc.,* 26 Ind. 522.

Section 12, article 1, of the constitution, has been before this court for construction on two separate occasions. *Wallace* v. *Board, etc.,* 37 Ind. 383; *Fulk* v. *Board, etc.,* 46 Ind. 150.

In the first case, the judges of this court were equally divided upon the question of the constitutionality of a law requiring fees for services performed by a county officer to be paid into the county treasury. In that case Judge Downey wrote an opinion holding that such a law was valid, while Judge Worden wrote an opinion holding the opposite view.

In the later case of *Fulk* v. *Board, etc., supra,* a majority of the court adopted the opinion of Worden. Neither of these opinions is elaborately reasoned, nor does either of the learned judges cite a single authority in support of his opinion.

The case of *Fulk* v. *Board, etc., supra,* we believe, stands almost entirely, if not quite alone, and is out of line with all the authorities upon the subject of which it

treats. The validity of provisions similar to those found in this statute, upon the subject of paying fees into the county treasury, has been affirmed by the Supreme Courts of Tennessee, Iowa, Nebraska, Rhode Island, Arkansas, North Carolina and Nevada. *Harrison* v. *Willis*, 7 Heisk. 35; *State* v. *Howran*, 8 Heisk. 824; *Adae & Co.* v. *Zangs*, 41 Iowa, 536; *Steele* v. *Central R. R.*, 43 Iowa, 109; *State* v. *Verwayne*, 44 Iowa, 621; *State, ex rel.*, v. *Board, etc.*, 4 Neb. 537; *Perce* v. *Hallett*, 13 R. I. 363; *Lee County* v. *Abrahams*, 34 Ark. 166; *Murphy* v. *State, ex rel.*, 38 Ark. 514; *Hewlett* v. *Nutt*, 79 N. C. 263; *State* v. *Judges*, 21 Ohio St. 1; *State* v. *Forgus*, 19 Nev. 247; *State, ex rel.*, v. *Ream*, 16 Neb. 681.

It is plain, we think, that the General Assembly never designed, by this act, to levy a tax for general revenue. Its purpose in requiring fees to be taxed and collected is to create a fund out of which those who perform official services may be paid the salaries fixed by the law. It is a matter of no concern to a litigant whether the sheriff who serves his writs is paid by him direct, or whether he receives his pay through the medium of the county treasurer, provided the amount paid by him is the same in either case. The sheriff's fees taxed to litigants under this law are less than the fees taxed under the law of 1879, and yet we have a litigant here seeking to overthrow this law on the ground that the fees taxed under it are a tax on litigation, in order that he may collect the higher fees for his own use. The claim, we think, is unreasonable, and without a shadow of equity to support it.

In the case of *State* v. *Judges, supra*, the Supreme Court of Ohio says: "It is competent for the Legislature to provide for compensating all public officers by salaries. If it should see proper to do so, we know of no provision of the constitution that would forbid ex-

acting from persons requiring, and who are specially benefited by the performance of official services, a reasonable compensation therefor, to be paid into the public treasury to reimburse the public for the expense incurred in providing and maintaining such offices. It is not essential to such exactions that they should enure to the personal benefit of the officer. The officers are but the agents of the State for transacting the public business; and it is, in its nature, a matter wholly immaterial to those requiring their services whether the amount to be paid therefor goes to the officer or into the public treasury, provided no more is exacted than is just and reasonable for the facilities afforded, and the services performed. If the exactions are called taxes, they become none the less such, as to those on whom they are imposed, by being paid to the officer, than if paid into the public treasury.''

This argument would seem to be unanswerable. Indeed, it may well be doubted as to whether a case has ever arisen in this country, to which the clause of the constitution under immediate consideration was applicable. It is first found, in substance, in *Magna Charta*, and was intended as a death blow to the corrupt and disgraceful practices of a corrupt judiciary in demanding oppressive gratuities for giving or withholding decisions in pending causes.

We are clearly of the opinion that the provisions of the statute under consideration are not in conflict with Section 12, article 1, of our State constitution, *supra*.

In support of the third and fourth objections to the validity of this enactment, it is contended that it is local and special because it does not include in its provisions persons who were elected to office prior to the time it took effect. It is said that under its provisions we have a class of officers in one county receiving fees under one

law, while the same class of officers in other counties are receiving salaries for the same class of services under another and different law, and that by reason of this fact the statute is local and special in its operation.

We are unable to agree with the appellee in this contention. This statute is not different, in legal effect, from what it would be did it read: *"Be it enacted by the General Assembly of the State of Indiana,* that all State and county officers hereafter elected shall receive the following fees and salaries, and no other."

In other words it was intended to, and does, apply alike to all officers elected after it took effect. We do not think such a statute is in conflict with any provision of our State constitution. If such a law is invalid, then it would be utterly impossible to make a valid statute reducing the salaries of our judicial officers, for it is expressly provided by the constitution that such salaries shall not be reduced during the term of an incumbent. A statute which is of general and uniform operation throughout the State, and operates alike upon all persons, under the same circumstances, is not subject to the imputation of being local and special. *Gilson* v. *Board, etc.,* 128 Ind. 65.

It is further contended by the appellee, that this statute is local and special in that it fails to fix a salary for the auditor, treasurer and recorder of Shelby county. This statute does fix a salary for the clerk and sheriff of every county in the State, including Shelby county, and whether this appellee can be heard to complain that the General Assembly failed to fix a salary for the auditor, treasurer and recorder of that county depends upon the preliminary question as to whether the provisions of the statute are so interlocked, and so dependent upon each other that the act must stand or fall as a whole, for we will not permit him to litigate a matter in which he has

no interest. A party can not be permitted to harrass others, and take the time of the courts in litigating matters in which he has no interests, and, for this reason, if the provisions of the act under immediate consideration are of such a character as that it can stand as to the appellee, while it might fail as to the auditors, treasurers and recorders, we will not stop to inquire whether it is or is not valid as to the latter.

The principle that a statute may be constitutional and valid in part, and unconstitutional and invalid in part, is elementary. The rule is that where a part of a statute is unconstitutional, if such part is so connected with the other parts as that they mutually depend upon each other as conditions, considerations, or compensations for each other, so as to warrant the belief that the Legislature intended them as a whole, and if they could not be carried into effect, the Legislature would not have passed the residue independently of that which is void, the whole act is void. On the other hand, where a part of a statute is unconstitutional, if by striking from the act all that part which is void, that which remains is complete in itself, sensible, capable of being executed wholly independent of that which is rejected, and is of such a character as that it may fairly be presumed that the Legislature would have passed it independent of that which is in conflict with the constitution, then the courts will reject that which is void and enforce the remainder. *Griffin, Sec'y of State,* v. *State, ex rel.,* 119 Ind. 520; *State, ex rel.,* v. *Blend,* 121 Ind. 514; *State, ex rel.,* v. *Gorby,* 122 Ind. 17; *State, ex rel.,* v. *Friedley,* 135 Ind. 119.

The argument of the appellee is that this statute embraces but one entire scheme, and, for this reason, if any portion of the law is unconstitutional the scheme fails and the entire act must fall.

We can not bring our minds to the conviction that the

attorney-general of the State, for the purpose of obtaining the larger salary given by former statutes, could defeat this law because it was defective as to the typewriter in the clerk's office of the Supreme Court. Nor do we think the clerk of the Supreme Court, for the purpose of retaining the fees taxed in his office, could defeat it because it was defective as to circuit judges. Nor do we think the Governor of the State could defeat it because it was defective as to some county officer. There is as little connection between the duty of a county sheriff, as such, and the duty of a county recorder as there is between the duty of the attorney-general and the typewriter in the clerk's office, and his duties are as distinct from those of the county treasurer as the duties of the clerk of the Supreme Court are from that of a circuit judge.

In fact there is no connection whatever, so far as his official duties are concerned, between a county sheriff and a county auditor, treasurer, or recorder. This statute as to county sheriffs is complete within itself, and capable of being executed independent of its provisions relating to county auditors, treasurers, and recorders.

In arriving at a conclusion as to whether the Legislature would probably have passed the act independent of the provisions relating to auditors, treasurers and recorders, it is not unimportant to consider the evils which the law was intended to remedy.

It is a matter of common notoriety, of which the courts take notice, that for many years prior to this enactment there was a bitter complaint against the practice of taxing what is known as constructive fees. Penal statutes had been passed, as well as statutes inflicting forfeitures, but it was found, on actual experience, that they did not eradicate the evil.

The sum illegally demanded and collected in the way

of constructive fees was large in the aggregate, but the amount taxed against each individual litigant was so small that it was cheaper to pay than to contest it. This complaint was wholly directed against the clerks and sheriffs of the State, and had no connection whatever with the office of auditor, treasurer, or recorder. It was the purpose of the Legislature, in enacting this statute, to strike an effective blow at the practice of taxing illegal and constructive fees by placing the officers who had previously taxed them upon a salary, depriving them of all fees, and thus removing the temptation to wrong-doing in that direction.

In view of the evil to be cured and the manifest purpose of the General Assembly, we think it not at all improbable that it would have passed this statute independent of its provisions relating to auditors, treasurers, and recorders. Having reached this conclusion, the rule that we will not decide a constitutional question when not necessary to a decision of the cause upon its merits, applies, and we will not, therefore, inquire as to whether the statute is or is not valid as to county auditors, treasurers, and recorders.

The title of the act is broad enough to include county sheriffs. The Legislature has declared in the act, as we have seen, that the salaries of county officers in the several counties of the State are graded according to the population and the necessary services to be performed.

In view of this declaration, we must assume that it had before it all the necessary information to enable it to fix such salaries upon a just and equitable basis, with a view of giving to each officer therein named a reasonable compensation for the services performed.

To say that the law in this respect is perfect, would, perhaps, be saying too much; but if there are hardships

and inequalities in the law, the remedy is with the Legislature and not with the courts.

We are of the opinion that this statute, so far as it relates to county sheriffs, is not subject to the constitutional objections urged against it, and that it is as to them a valid law.

It follows, from this, that the circuit court erred in overruling the appellant's demurrer to the complaint in this cause.

Judgment reversed, with directions to the circuit court to sustain the appellant's demurrer to the complaint.

Filed Jan. 25, 1894; petition for a rehearing overruled May 15, 1894.

### DISSENTING OPINION.

McCABE, J.—I heartily concur in the foregoing opinion in so far as it holds the act not unconstitutional because of there being a plurality of subjects of legislation embraced therein. · I also concur in the prevailing opinion as to the duty of the courts to solve doubts as to the constitutionality of a statute in favor of its constitutionality because of the extraordinary power exerted in overthrowing the deliberate act of a co-ordinate branch of the State government. But in the balance of the opinion I can not concur. When there is no doubt as to the unconstitutionality of an act, as in my opinion is the case here, then the highest and most sacred duty that ever devolved on a tribunal or court calls loudly on the court to uphold the constitution and let the statute go down. Statutes, though entitled to implicit obedience when valid, are temporary, and can be remodeled every two years. But constitutions are supreme and permanent. They are not so ephemeral as statutes. Our State is now seventy-eight years old, and yet during that whole time we have made but one new constitution.

One of the most formidable objections urged against

the constitutionality of the act is the provision in section 136, Acts 1891, p. 452, by which it is provided that "where any clerk, auditor, recorder, treasurer, or sheriff has been elected by the people of his county before the taking effect of this act, such officer so elected, during the time that he holds such term, shall not be subject to the provisions of this act. He shall hold such term of office, and perform the duties thereof, and receive the compensation prescribed by the law the same as if this act had not passed." Section 20 makes the same provision as to State officers.

It is claimed that this makes the act both special and local in violation of sections 22 and 23 of article 4 of the constitution. So much of said sections as is applicable reads as follows: "22. The General Assembly shall not pass any local or special laws in any of the following enumerated cases," that is to say: (Then follow seventeen subjects enumerated among which is the following) "In relation to fees or salaries; *except that the laws may be so made as to grade the compensation of officers in proportion to the population and the necessary services required.*" (The words italicized were added to the section by the amendment to the constitution March 14th, 1881).

"Section 23. In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the State."

It is contended that the act is local because it only operates in those counties where the several officers named have been elected since the passage of the act, and in those counties where a part only of those officers have been elected since the passage of the act, it only partially operates in such counties. An act may be special that is not local within the meaning of this provision of the constitution; that is, special as it applies only to a part

of certain things, all of which would be included if it were made general,or to a part of the people, all of whom would fall within its purview if it were made general. *Mitchell* v. *McCorkle*, 69 Ind. 184.

Where a statute applies to and operates only in a certain locality in the State, it may then be said to be both special and local; local because it is confined in its operation to a certain locality, and special both because it is confined in its operation to that locality and to the people of that locality.    Sutherland Stat. Con., section 127.

On the seventeen subjects named in section 22, above quoted, before the amendment of March 14th, 1881, the enactment of both special and local statutes was forbidden. Section 23, *supra*, forbids such legislation as to all other subjects "where a general law can be made applicable," all of which general laws it required to be of uniform operation throughout the State.    It is not even claimed by the learned counsel for the appellant, that section 22 *supra*, has been so changed by the amendment of March. 14th, 1881, as to authorize the enactment of the special provision exempting from its operation all officers elected prior to the taking effect of the act; but it is contended that the act is not made special by that provision, but that its operation remains general and uniform throughout the State, notwithstanding such provision.    Special and local laws upon the subject of fees and salaries are still forbidden under this provision of the constitution with the one exception, namely, that the laws "may be so made as to grade the compensation of officers in proportion to the population and the necessary services required."

The provision that all officers elected before the taking effect of the act shall not be subject to its provisions, has nothing whatever to do with "grading the compensation of officers in proportion to population and nec-

essary services required." Nor are these provisions either in aid of, incident to, or necessary for, the accomplishment of such gradation. It could have been accomplished as well, and even better, without such a provision. Had the act been made local and even special, necessarily, in accomplishing the constitutional permit "to grade compensation of officers in proportion to population and necessary services required," a very different question would have been presented.

The question then is, does this provision make the whole act special and not of uniform operation throughout the State within the meaning of the two sections of the constitution referred to? It may be readily conceded that the Legislature, in passing a new law to take the place of an old one, often has provided and may provide for special cases falling close to the line where the old law goes out and the new law comes into force, to the effect that such cases are to be governed by the old law even after the new law takes effect. The power to so legislate arises out of necessity, because without such power, some cases would have no law to govern them.

This court has held that "the legislative authority of this State is the right to exercise supreme and sovereign power, subject to no restrictions except those imposed by our own constitution, by the federal constitution, and by the laws and treaties made under it." *Beauchamp* v. *State,* 6 Blackf. 299; *McComas* v. *Krug,* 81 Ind. 327; *Campbell* v. *Dwiggins,* 83 Ind. 473; *Mount* v. *State, ex rel.,* 90 Ind. 29.

This broad and sweeping power to legislate, by necessary implication, carries with it the power to legislate so as to provide for every conceivable case, and so that no case will be without a law to govern it. But there was no such necessity in this act; it could have been so framed that all officers would have been subject to its provisions

whether elected before or after it took effect, and so that all people who are liable to pay costs and fees to such officers under its provisions, would have been alike entitled to its benefits; or, on the other hand, if not beneficial, that all alike would have been subject to its burdens. So that we conclude that, in order to conform to the sections of the constitution referred to, in respect to the objection under consideration, the act must be general and of uniform operation throughout the State.

This leads us to inquire, what is a general law? And when is a law of general and uniform operation throughout the State?

The attempt to define such a law was made by this court in *Groesch* v. *State*, 42 Ind. 547, where it is said: "It can not be held that the framers of the constitution intended that the operation of laws throughout the State should be uniform in any other sense than that their operation should be the same in all parts of the State under the same circumstances and conditions."

And, in *Hanlon* v. *Board*, etc., 53 Ind. 123, the definition is that a statute is general when "it operates uniformly and alike in all parts of the State, under like facts."

The same definition was repeated and adopted in *State, ex rel.*, v. *Reitz, Aud.*, 62 Ind. 159. And, in *Gilson* v. *Board, etc.*, 128 Ind. 65, a general statute was defined to be one that "operates alike upon all persons under the same circumstances."

These cases are confidently relied on by the learned counsel for the appellant, as a complete refutation of the charge that the act of 1891 is special, because they say it operates throughout the State on all persons under the same circumstances and under like facts.

It must be confessed that the act does operate throughout the State upon all persons under the same circum-

Henderson, Auditor, *v.* The State, *ex rel.* Stout, Sheriff.

stances and under like facts.   This leads us to inquire whether or not the foregoing definitions of what it takes to constitute a general statute of uniform operation throughout the State are not too narrow for all cases? They were broad enough and strictly correct as applied to the cases in which they were used.   But it is manifest that there may be cases in which such definitions would be entirely too narrow.   For instance, suppose instead of the provision that the officers elected prior to the taking effect of the act should not be subject to its provisions, it had provided that officers less than five feet high, or officers with blue eyes, officers of a designated political faith or party, or officers of a certain religious denomination, or officers of a certain nativity, should not be subject to its provisions.

It is believed that no one would be bold enough to assert that such a law would be general and of uniform operation throughout the State, and that all must admit that it would be special within the meaning of the constitution.   And, yet, if the foregoing definitions are to be accepted as broad enough to cover all cases, such a law must be held to be no infringement of the sections of the constitution referred to.

The courts of last resort in other States have encountered the same difficulty that this court has in attempting to define what it takes to constitute a general statute of uniform operation throughout the State.

In *Randolph* v. *Wood*, 49 N. J. Law, 85, it is said: "Such a law must embrace all and exclude none whose condition and wants render such legislation equally necessary or appropriate to them as a class."

In *People* v. *Cooper*, 83 Ill. 585, it is said, in substance: A law is not general in any correct sense of the term, but is special where it is suspended in one locality where there exists a proper subject-matter on which to operate,

but remains in full force and vigor in another locality of exactly the same kind.

Mr. Freeman, in a note to *State, ex rel.,* v. *Ellet,* 47 O. St. 90, 21 Am. St. R. 772, states the law thus: "Any legislation which is arbitrary, which deals with particular persons or things of a class, or which confers privileges or burdens on towns or cities, while other cities or towns in like situation are excepted from its operation, is special and void."

In *Ex parte Westerfield,* 55 Cal. 550, it is said: "A general law must include within its sanction all who come within its purpose and scope. It must be as broad as its object."

Sutherland on Stat. Con., section 127, says: "Special laws are those made for individual cases, or for less than a class requiring laws appropriate to its peculiar condition and circumstances; local laws are special as to place. When prohibited they are severally objectionable for not extending to the whole subject to which their provisions would be equally applicable, and thus permitting a diversity of laws relating to the same subject. The object of the prohibition of special or local laws is to prevent this diversity. Each subject as to which such laws are prohibited is by such inhibition designated as a subject of only general legislation which shall have a uniform operation. Generality in scope and uniformity of operation are both essential. A law which embraces a whole subject would still be special if not framed to have a uniform operation."

It will be observed from these quotations, that the task of adequately and satisfactorily defining what is meant by the term "general laws of uniform operation throughout the State" is a difficult one.

It may be that no general definition can be devised that will suffice in all possible cases, and that each par-

ticular case, as it may arise in the future, may add to the material out of which a satisfactory and sufficient definition may be constructed.   This case furnishes the means of adding something to the definition hitherto given by this court, correct enough as far as it went, and as applicable to those cases.   A statute can not be rendered general and of uniform operation throughout the State within the meaning of the constitution by an arbitrary act of the Legislature in fixing a certain set of circumstances and facts under which all persons must come or be found before the statute can operate upon them, if those facts and circumstances are such as to deprive those not coming or found under such circumstances of their equal rights as between man and man, or citizen and citizen.   And the same would be true if the facts and circumstances arbitrarily fixed deprived those found or coming under such circumstances and upon whom alone the law is to operate, of their equal rights possessed by them in common with those upon whom the law is not to operate.

The equal rights of all before the law is a principle inherent in the genius of our government, and the maintenance of that principle is amply secured by the various sections of article 1, of our State constitution, commonly called the Bill of Rights.

If the act of 1891 is an improvement of the condition of the officers upon whom it operates, if it is more beneficial than the old law, then there is no principle of right, justice or equality of rights between men, that can justify the provision that those officers, both State and county, who were elected before the taking effect of the act, shall not be subject to, and entitled to, the benefits of its provisions, while those elected since are entitled to such benefits; and, likewise, if its provisions are beneficial to the numerous persons who are to pay costs and fees,

there can be no justification on the principle of equality of rights, in depriving them of the benefits of the act, which it does, simply because the officers to whom they are to pay such fees and costs happened to be elected before the taking effect of the act, while all those officers who are elected since the taking effect, and all those persons who are to pay to them fees and costs specified in it are to enjoy its benefits and advantages simply because such officers happened to be elected since the taking effect thereof, while the officers elected prior to the taking effect of the act and those who are to pay them their fees and costs are bearing the burdens heaped upon them by the old law.

On the other hand, if the new law is less beneficial and more burdensome to the officers and those who are to pay them the costs and fees provided for, there can be no justification on the principle of equality of rights in compelling them to bear the increased burdens and disadvantages of the new law simply because such officers happen to be elected since the taking effect of the act, while those officers, elected prior to the taking effect of the act, and all those who are to pay them the fees and costs, are bearing the lighter burdens and enjoying the superior advantages of the old law.

This court must take judicial knowledge of the fact that many of the clerks, auditors, and recorders had been elected to four year terms prior to the taking effect of the act, and which terms did not begin until long after it took effect.

Thus very many four-year terms began and will end after the new law was to take effect, and, consequently, if the law is upheld, there will scarcely be a county in the State where one and the same law will prevail regulating fees and costs. In nearly every county, some of the officers and some of the persons who pay costs and

fees will be governed by one law, and other officers and those who pay costs and fees to them, will be governed by another law. I do not mean to assert that the Legislature has no power to pass a local or special law. On the contrary, our cases abundantly establish that on any subject other than the seventeen mentioned in section 22, article 4, *supra,* of the constitution, the Legislature may pass a special or local law, if a general law can not be made applicable. But the act here in question falls within the category of one of the seventeen subjects where a special law is absolutely prohibited unless it be in the gradation of the compensation of officers in proportion to population and necessary services required. As we have already seen, the provision in question has no reference to, or effect upon, such gradation.

Appellee's counsel make copious quotations from the case of *People* v. *Henshaw,* 76 Cal. 436, in support of their contention that the act of 1891 is not special. The Legislature of that State had created a police court for the city of Oakland, with a schedule of fees payable to the city. Afterwards a general act was passed providing that the police powers of every city having over thirty, and under one hundred, thousand inhabitants should be vested in a police court, to be held therein by the city justices to be designated by the mayor. Exclusive jurisdiction was given to these courts over certain offenses. The act then provided as follows: "The act to go into effect upon the expiration of the term of office of the present police judge of said cities, or when a vacancy occurs therein."

It is hardly necessary to say that the case is not very strongly in point, because it only applied to one office in each municipal government, so that perfect uniformity of operation of the law as to everybody and everything within each municipal government was strictly pre-

served.   A citizen or officeholder of one of such municipalities would have no right to complain because the term of the police judge in another municipality expired before that of the police judge in his own municipality, thereby bringing the new law into effect in his neighboring municipality before it did in his own.   This would afford him no more ground for complaining that such law was not of general and uniform operation than would the fact that the rate of taxation in his own municipality, for municipal and local purposes, is much higher than in his neighboring municipality.   Other reasons might be suggested why that case is not in point. But the Supreme Court of California has decided a case that is exactly in point here.   The Legislature of that State having passed a fee and salary law, afterwards passed an act making important and extensive amendments thereto.   The following provisions were added to the amended law:

"Sec. 3.   The salaries herein provided shall not take effect nor be in force until the expiration of the terms of the present officers, except as hereinafter provided.

"Sec. 4.   The salaries herein provided for the officers of the tenth, thirty-fifth and forty-sixth classes shall take effect and be in force from and after the first day of the first month next succeeding its passage."

The court said, in *Miller* v. *Kister*, 68 Cal. 142: "By these sections the operation of the law upon the subject of the compensation of officers in the fifty-two counties of the State, except the counties of three classes, is suspended until the expiration of the terms of the then incumbents in office, and is put in force almost immediately upon officers of the three specified classes. Unquestionably, the Legislature has power to suspend the operation of the general laws of the State. 'But when it does so,' says Cooley, in his work on con-

stitutional law, page 391, 'the suspension must be general, and can not be made in individual cases or for particular localities.' A law speaks from the time it goes into effect. *People, ex rel.,* v. *Johnston,* 6 Cal. 673.

"In forty-five of the forty-eight classes into which the fifty-two counties of the State have been divided, the statutes of 1885 do not speak at all. They speak only in counties of three classes. In other words, after classifying the counties of the State, and regulating the compensation of the county officers therein, the laws by which the classification and regulation are accomplished are declared inapplicable during the terms of office of officers of forty-five of the forty-eight classes, and applicable during the terms of office of three classes only; the operation of the law is therefore exceptional and eccentric, and is causative of discrimination between the officers upon which it is to operate. It in effect declares that the law shall not operate upon the large majority of county officers in the counties of the State, but shall operate upon the officers of three or four counties only. The very few are thereby excluded from the privileges accorded to the many. This the Legislature could not do. The constitution requires that all laws of a general nature shall have a uniform operation. (Section 11, article 1.) Where particular persons are excepted from the operation of a general law, it destroys the uniformity of its operation. *Omnibus R. R. Co.* v. *Baldwin,* 57 Cal. 165.

"So it is said in *French* v. *Teschemaker,* 24 Cal. 544: 'The Legislature can not discriminate or grant an indulgence to one which is not accorded to another. Every general law must have a uniform operation, that is to say, it must operate equally upon all persons and upon all things upon which it acts at all.' "

It will not do to say that the holding of the act in question is special, and therefore unconstitutional, for the

reasons stated would result in declaring it constitutionally impossible for the Legislature to reduce the salaries of the judges of the Supreme and circuit courts. The true and only reason why a legislative act reducing the salaries of the Supreme and circuit judges must and can only be made to apply to those elected or appointed after the taking effect of such an act, is that section 13 of article 7 of the constitution forbids their salaries from being reduced while they are in office. Therefore an act making such reduction to apply only to such judges as were elected or appointed after the taking effect of such act, would not be special within the principles I have laid down, because it would operate upon every one of the class to which it refers on whom it would be constitutionally possible for it to operate. No such principle applies to county and State officers.

I can not entertain a shadow of a doubt that the act is general in its nature, and that it is made special within the meaning of the constitution by sections 20 and 136, *supra*, I think it is also in conflict with section 12 of article 1 of the constitution, *supra*, R. S. 1881, section 57. That section requires justice to be "administered freely and without purchase." And this leads me to inquire what was the intention of the framers of the amendment of March 14th, 1881, to section 22 of article 4 of the constitution, *supra*, as to the nature and kind of legislation on the subject of fees and salaries and compensation of officers they and the people had in mind in adopting it. They must have intended to so change that section of the constitution as to permit such legislation as the section inhibited as it stood before.

That section did not forbid legislation before, requiring officers to pay into the county or State treasury fees and costs collected for services rendered by them, and the amendment is utterly silent upon that subject. There-

fore no purpose or intention to authorize legislation requiring such payment into the treasury can be gathered from the section as amended. At the time of the adoption of the amendment, a decision of this court had been standing for seven years, and it still stands undisturbed to the effect that a fee and salary law requiring officers to pay into the public treasury fees and costs collected by them **for** services rendered, was and is unconstitutional, because a violation of said section 12 of article 1 *supra*, requiring justice to be administered freely and without purchase. *Fulk* v. *Board, etc.*, 46 Ind. 150; *Wallace* v. *Board, etc.*, 37 Ind. 383.

If it had been the intention of the framers of the amendment to authorize or permit a fee and salary law, or a law providing compensation for officers, to require them to pay costs and fees collected for services rendered by them, into the public treasury, they would undoubtedly have framed an amendment to said section 12. Because we must presume that the framers of the amendment knew that this court had long since decided that that section was an unsurmountable obstacle in the way of such legislation, and that such a system for the compensation of officers could not be authorized by statute. I am therefore of opinion that it was not within the contemplation or intention of the framers of the amendment of March 14, 1881, to so change the constitution as to permit legislation providing for the compensation of public officers so as to require them to pay into the public treasury costs and fees for services by them collected; and that, therefore, the act of 1891 is in that respect in violation of the constitution, and void. But it seems to me that the purpose and manifest intention of the framers of the amendment was to so change the section amended as to permit the enactment of a statute upon the subject that the section before forbid. So, as it now

stands, no local or special law can be enacted "in relation to fees and salaries, except that the laws may be so made as to grade the compensation of officers in proportion to the population and necessary services required." That is, if it is necessary in order to so grade the compensation, the act may be made both special and local in the accomplishment of that object, and not otherwise.

We take judicial notice that one important factor that gave rise to the amendment was the fact that according to the ordinary schedules of fees and costs which would produce no more in a county of small population than a reasonable compensation for its officers would, in counties of the largest population, produce large fortunes to the officer in a single term.   Now it was to obviate this evil that the amendment was adopted.   The design was to authorize such legislation as would prevent such officers from drawing from those who unfortunately are liable to pay their costs and fees, a greater amount than will make a reasonable compensation for such service, when the whole official service for a year or a term is considered together.   This has always been the guide in fixing the rate of fees and costs, namely, what rate will raise a sufficient sum, at the end of a given period, to adequately compensate the officer for his service and his time.

When the constitution was adopted, no large centers of population existed in the State, and the population of each county was sparse compared with what it was at the end of thirty years thereafter, when the amendment of 1881 was adopted.   The increase of business has more than kept pace with the increase of population, thereby rendering any fixed schedule of fees for all the counties alike, as was required before the amendment, wholly unjust; that is, if it should be fixed low enough to make only a reasonable compensation for time and service of

Henderson, Auditor, *v.* The State, *ex rel.* Stout, Sheriff.

the officers in the more populous counties, it would not yield enough to compensate the officers in the counties of smaller population. And, on the other hand, to fix the schedule high enough to yield a sum sufficient to adequately compensate the officers of counties of smaller population for their time and service, it would yield a sum sufficient, in the counties where centers of population existed, to make fortunes in a single term for some of their officers.

The necessity for legislative power to regulate the compensation according to population and service was at once seen, and hence the amendment was suggested and adopted. Before the amendment, the rate to be fixed in the schedules must necessarily be the same in every county, because to fix a different rate for different counties would make the act so doing both special and local, in direct contravention of the section before its amendment.

Before amendment, it read thus:

"22. The General Assembly shall not pass local or special laws in the following enumerated cases: * * * that is to say: * * * In relation to fees or salaries."

Since the amendment, it reads thus:

"22. The General Assembly shall pass no local or special laws in the following enumerated cases, that is to say: * * * In relation to fees or salaries; except that the laws may be so made as to grade the compensation of officers in proportion to the population and necessary services required."

All will agree that it was the manifest purpose and intention of the amendment to so change the section as to permit legislation of a character in relation to fees and salaries, that the section before forbid, else there would have been no reason for making the amendment. There can be no gradation of compensation of State officers in

proportion to population, and therefore the amendment had reference to county officers alone. Their compensation can be graded, both in proportion to the population and services required.

The scheme of the act of 1891 is to accomplish such gradation by placing all county officers on salaries, varying in amount in proportion to population and necessary services required. This is conceded by appellee's counsel. And as a part of that scheme a schedule of fees and costs is fixed for official services which litigants and persons liable are required to pay; and all of which is to be paid after collection by the officers into the county treasury.

Now, that part of the act of 1891 which places county officers on salaries in proportion to population and services required, was not certainly within the purpose of the amendment of the constitution already referred to, because this court had expressly decided, in *Hanlon* v. *Board, etc.*, 53 Ind. 123, that such a gradation of compensation of county officers was not a violation of the section of the constitution in question before its amendment. That case had stood as the declared law unquestioned for fifteen years, when the amendment was adopted, and still so stands.

The framers of the amendment must be presumed to have known what the law was, as everybody is presumed to know what the law is. They knew that no amendment of the constitution was required to authorize the Legislature to make such a gradation of compensation to county officers. They, therefore, must have had in contemplation some other method of gradation than that embodied in the act of 1891, or that of 1875 held valid in the case above referred to, the gradation in both acts being alike so far as the question here involved is concerned. Another reason why the method of gradation

and compensation adopted in the act of 1891 was not designed by the framers of the amendment is found in the fact that such method is a violation of the section as amended.

What is it that the section, as amended, requires to be graded in proportion to population? The section, as amended, almost answers the question itself.

Local or special laws are prohibited by it: ''In relation to fees or salaries; except that the laws may be so made as to grade the compensation of officers in proportion to the population and necessary services required.''

Manifestly *fees* are to be graded as well as *salaries*. Graded how? Why, in proportion to population and necessary services required. What does that mean? It means, as all candid minds must admit, that the amount of the fee to be fixed in the statute for a designated official service shall bear some relation to the work of the service, and, also, to the size of the population in the county. It means that both of these matters must be taken into consideration in fixing the size or amount of the fee in the statute for each item of official service. It can mean nothing else, because there is nothing else to which the words can be applied.

In a county containing a great center of population, a lower fee ought to be fixed than in a county of small population, and yet the necessarily increased service on account of increased population must not be ignored and must be taken into consideration also in fixing the amount of fees. In other words, the intention was to require the fees to be fixed at such amount as would be a fair compensation for the service to be performed, taking into consideration these two elements. But the method adopted in the act of 1891 is utterly contrary to this intention. The same fees are fixed by it for a county of the largest population that are fixed for a county of

the smallest population. No matter what the service required, no matter what the population, the fees are the same throughout the State, just as was required by the section before its amendment.

There is no gradation of fees according to population and necessary services required, and, therefore, the act violates the manifest purpose and intent of the section as amended. But that is not all. The fees are made the property of the county and a source of public revenue, and enure to the benefit, not of the class who were the sufferers by the old system, but enure to the benefit of the public who did not suffer under the old system, the evils complained of under the only system allowed before the amendment, and which gave rise to the amendment, were that those who had to pay costs and fees, were compelled to pay too much, more than the service was worth, so that a single official term, in some instances, would make a fortune for the officer.

In determining what meaning words in a constitutional provision were intended to have, it is proper to consider the circumstances under which the provision was adopted, and its purpose. *City of Valparaiso* v. *Gardner,* 97 Ind. 1.

The act, instead of applying a remedy for the relief of the only sufferers from the evils complained of, which was the manifest design of the amendment, leaves those evils practically untouched, so far as those sufferers are concerned, and turns the stream of unearned wealth, unjustly taken from them, without value received, into the public treasury as a source of public revenue. Instead of relieving the unfortunate, who have the costs and fees to pay, by reducing them down to the actual value of the service, considering population with necessary service, they are placed at such a rate, regardless of service and population, as will yield a public revenue

beyond the amount necessary to pay the officers' salary. Multitudinous ways have hitherto been devised in governments among men for raising revenue. The incomes of the rich and the luxuries of the wealthy, and those who succeed to property by inheritance or devise, have all been taxed in various ways to raise public revenue, but it has been reserved to the nineteenth century to lay tribute upon men's losses and misfortunes to raise public revenue out of costs of litigation, and that, too, under a constitution requiring justice to be administered freely and without purchase.

Clearly the method of regulating fees, adopted in the act of 1891, was not intended and not contemplated in the amendment to the constitution of March 14th, 1881. There is only one other method the framers of that amendment could have contemplated, and that is to classify the counties according to population and necessary services required, and fix a separate and different schedule and rate of fees for each class. Such a method could not have been adopted before the amendment, but is in perfect harmony with it, and accords with all the circumstances leading up to its adoption. But it may be suggested that the method designed in the amendment is only permissive, and not mandatory or compulsory on the Legislature; that the old method of fixing a schedule or rate of fees uniform throughout the State is not inhibited by the section as amended. That may be conceded, and yet if the fees are not "graded in proportion to population and necessary services required," then there is nothing in the act to take it out of the operation of the inhibition in the section as amended, against the enactment of a special law in relation to fees and salaries, and we have seen the act is special, and not of general and uniform operation throughout the State.

As before remarked, the amended section permits a

law in relation to fees and salaries to be both local and special, when that is necessary, in order to grade fees and salaries in proportion to population and necessary services, and in no other case.   Therefore, as the local and special feature of the act is not in aid of a gradation of fees according to population and services required, the only case in which such special and local feature is allowed, and outside of which it is forbidden, the act is clearly in conflict with the constitution in that respect.

I think the act is unconstitutional in another respect. It provides a schedule of fees to be taxed by all county officers in the State, and makes such fees, when taxed, the property of the county in which they are taxed.   It provides a salary for every county officer in the State except in Shelby county, where it provides no salary or compensation for the treasurer, auditor or recorder.   As we have seen, that makes the act both local and special, and it is not done in aid of or as incident to a gradation of fees or salaries.

In speaking of a similar act, the Supreme Court of Pennsylvania said:   "It was not then a general act.   It did apply to a great number of counties, but there is a dividing line between a local and a general statute.   It must be either one or the other.   If it apply to the whole State it is general; if to a part, it *is* local.   As a legal principle it is as effectually local when it applies to sixty-five counties out of sixty-seven as if it applied to one county only.   The exclusion of a single county from the operation of the act makes it local."   *Montgomery* v. *Commonwealth*, 91 Pa. St. 125; *Devine* v. *Board, etc.*, 84 Ill. 590; *McCarthy* v. *Commonwealth*, 110 Pa. St. 243.

Another act applicable to one county was held local. *Commonwealth* v. *Patton*, 88 Pa. St. 258; *State, ex rel.*, v. *Harrmann*, 75 Mo. 340; *Weinman* v. *Wilkinsburg, etc.*, *R.*

*W. Co.*, 118 Pa. St. 192; Sutherland Stat. Con., sections 127, *supra*, and sections 128, 129 *id.*

Nor can we agree with the prevailing opinion that, conceding this constitutional objection well taken, it only nullifies a part of the act, and that the other part can stand. That is, I understand the prevailing opinion to hold that, at most, the objection could only vitiate so much of the act as relates to auditors, treasurers and recorders, and as the appellee here is a sheriff, and not an auditor, treasurer, or recorder, it does not vitiate as to sheriffs and clerks; and, therefore, that appellee has no interest in the question, etc.

It is true that a part of a statute may be unconstitutional and another part constitutional; and when the part constitutional does not depend upon the unconstitutional part, and is capable of being enforced and operative without the aid of the unconstitutional part, then the unconstitutional part may be stricken down and the other part upheld and enforced. But that only can be done when the part upheld is not rendered local or special or otherwise conflicting with the constitution, by striking down the other part. *State, ex rel.,* v. *Blend,* 121 Ind. 514, and authorities there cited.

If, by striking down an unconstitutional part of a statute, the remaining part is thereby brought into conflict with the constitution, such part can not be upheld simply because such part is not inimical to the constitution while the whole stands together.

Therefore, if it be conceded that by leaving out treasurer, auditor and recorder of Shelby county, the act is unconstitutional as to the three offices named all over the State, the part of the act relating to clerk and sheriff is not relieved from the charge of being special by striking down that relating to the other three offices, but is thereby made more special than before.

There is no escape from this, unless we assert, successfully, that the fees and salaries of clerks and sheriffs belong to one subject of legislation, and that those of auditor, treasurer and recorder belong to another and entirely different subject. To successfully maintain that proposition would be to render the whole act void for conflicting with another provision of the constitution.

To hold that the act may be upheld as to sheriff and clerk, and stricken down as to auditor, treasurer and recorder, is to hold that clerks and sheriffs, as to fees and salaries, may be governed by the law of 1891, and auditors, treasurers and recorders may be governed by the law of 1879, or no law at all. It is to assert that clerks and sheriffs shall not own the fees they tax for their services, and that such fees shall belong to the county, but that they shall be compensated by a salary, while auditors, treasurers and recorders shall own the fees they are authorized to tax, and shall receive them in compensation for their services. If this does not make the act special within the meaning of the constitution, then all the authorities I have quoted on that point are at fault.

To say that appellee's relator, Stout, is not interested because the defect in the law as to Shelby county does not affect sheriffs, and the defect as to being special in not applying to those elected prior, as he was elected sheriff since it took effect, seems to me wholly without foundation in reason or authority. He presented a claim to the auditor of State, every dollar of which, amounting to over two hundred dollars, he was entitled to receive in the form in which he presented the claim to the auditor, if the act of 1891 is unconstitutional and void, and not a cent of which is he entitled to receive if the act is valid; besides, if the act is valid, he must pay the costs of this litigation, amounting, probably to one hun-

dred dollars more, none of which would he have to pay if the act is invalid.

If he can secure a decision that the act is unconstitutional, he gains three hundred dollars; if not, he loses it. It seems to me that makes him so much interested that he is not a mere volunteer. This brings him within the requirement of the law to enable him to raise the question of the constitutionality of the act. Cooley's Const. Lim. (6th ed.), 196, 197; 3 Am. and Eng. Encyc. of Law, 676.

In *People* v. *Purdy*, 2 Hill, 31, it was said, by Bronson, J.: "Written constitutions of government will soon come to be regarded as of little value, if their injunctions may be thus lightly overlooked; and the experiment of setting a boundary to power, will prove a failure."

Again, in the same case, in the court of errors, *Purdy* v. *People*, 4 Hill, 384, it was said: "If courts venture to substitute for the clear language of the instrument their own notions of what it should have been, or was intended to be, there will be an end of written constitutions. In construing the language of the constitution, courts have nothing to do with the argument from inconvenience. Their sole duty is to declare, *ita lex scripta est*—thus saith the constitution." 21 Wend. 584.

I think the judgment should be affirmed.

Filed Jan. 25, 1894.