## CARR v. THE STATE OF INDIANA.

[No. 21,619.  Filed February 23, 1911.]

1.  CRIMINAL LAW.—*Appeal.—Instructions.—Bills of Exceptions.*— Instructions in a criminal case, to be considered on appeal, must be brought into the record by a bill of exceptions.  p. 243.
2.  CRIMINAL LAW.—*Offenses.—Statutes.—Public Policy.*—All crimes in Indiana are statutory; and the public policy of the State relating thereto is wholly a legislative matter.  pp. 245, 260.

Carr *v.* State—175 Ind. 241.

3. CONSTITUTIONAL LAW.—*Overthrowing Statutes.*—It is the duty of a litigant seeking to overthrow a statute to point out the particular'provision of the Constitution that appears to be violated; but it is the duty of the Supreme Court to sustain such statute unless it is clearly and positively in violation of the Constitution, the legislature being supreme except as its power is prescribed by the state and federal Constitutions, and the federal statutes and treaties. p. 246.

4. CONSTITUTIONAL LAW.— *Class Legislation.— Sunday Baseball Statute.*—The act of 1909 (Acts 1909 p. 436), providing that "whoever * * * is found on the first day of the week, commonly called Sunday, rioting, hunting, fishing, quarreling, at common labor or engaged in his usual avocation, works of charity and necessity only excepted, shall be fined, * * * but nothing herein contained shall be construed to affect such as conscientiously observe the seventh day of the week as the Sabbath * * * or persons engaged in playing the game of baseball between the hours of 1 o'clock p. m. and 6 o'clock p. m., and not less than one thousand feet distant from any established house of worship or permanent church structure used for religious services, or any public hospital or private hospital erected prior to the passage of this act," and repealing a conflicting statute, does not violate article 1, §23, of the Constitution, providing that "the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens," on the ground that it grants special privileges and immunities to baseball players and companies operating baseball games. Myers and Monks, J.J., dissent. pp. 249, 262.

5. STATES.—*Legislative Powers.—Police Power.*—In the exercise of the police power the legislature has a wide discretion, the laws relating thereto having to be changed to meet changing social, economic and political conditions. p. 261.

6. STATES.—*Sunday Laws.—Police Power.*—The validity of Sunday laws is upheld under the police power, on the ground that a public necessity exists for rest; but while the observance of such laws furnishes time for religious worship and works, they cannot be upheld on religious grounds. p. 261.

7. CONSTITUTIONAL LAW.—*Class Legislation.—Sunday Laws.— Baseball.*—In the enactment of Sunday laws the legislature may exempt persons engaged in certain employments from the penalties of such laws, if the nature of such employments furnishes a proper reason therefor. p. 263.

From Criminal Court of Marion County (38,108); *James A. Pritchard*, Judge.

Prosecution by The State of Indiana against Charles C. Carr. From a judgment of conviction, defendant appeals. *Reversed.*

*Roemler & Chamberlain, Ayres & Jones, Ralph K. Kane* and *F. Winter,* for appellant.

*James Bingham,* Attorney-General, *Smith, Duncan, Hornbrook & Smith, A. G. Cavins, E. M. White* and *William H. Thompson,* for the State.

Cox, J.—On May 24, 1909, appellant, who followed baseball playing for hire as a vocation, was charged, by affidavit in the Criminal Court of Marion County, with a violation of the Sunday observance law by playing baseball on Sunday, May 23, 1909. No question was raised as to the sufficiency of the affidavit, and appellant was tried on it and convicted by a jury. A motion for a new trial and a motion in arrest of judgment were successively overruled, and judgment was rendered, from which this appeal is taken.

The instructions given and refused by the trial court have not been brought into the record by a bill of exceptions, as required in criminal cases, and errors urged by appellant, based on the action of the court in giving and in refusing to give instructions, cannot be considered. *Donovan* v. *State* (1908), 170 Ind. 123.

The other assignments of errors center in the one question of the validity of the act of March 8, 1909 (Acts 1909 p. 436), which purports to amend §467 and to repeal a part of §468 of the act concerning public offenses, approved March 10, 1905 (Acts 1905 p. 584). Said act of 1909 reads as follows: " Section 1. Be it enacted by the General Assembly of the State of Indiana, that §467 of the above-entitled act be and the same is hereby amended to read as follows: Section 467. Whoever, being over fourteen years of age, is found on the first day of the week, commonly called Sunday, rioting, hunting, fishing, quarrelling, at common labor or engaged in his usual avocation, works

of charity and necessity only excepted, shall be fined not less than $1 nor more than $10; but nothing herein contained shall be construed to affect such as conscientiously observe the seventh day of the week as the Sabbath, travelers, and those engaged in conveying them, families removing, keepers of toll-bridges and toll-gates, ferrymen acting as such and persons engaged in publication and distribution of news, or persons engaged in playing the game of baseball between the hours of 1 o'clock p. m. and 6 o'clock p. m., and not less than one thousand feet distant from any established house of worship or permanent church structure used for religious services, or any public hospital or private hospital erected prior to the passage of this act.

"Section 2.  So much of §468 of said act approved March 10, 1905, as makes it unlawful for any one to engage in playing any game of baseball between 1 o'clock p. m. and 6 o'clock p. m. on Sunday is hereby repealed."

The record discloses, with others, the following uncontradicted material facts, upon which appellant was found guilty: That on and prior to May 23, 1909, appellant was a professional baseball player, and was pursuing that vocation as the manager and first baseman of the Indianapolis Baseball Club, which was associated with clubs in seven other cities, and with them formed the clubs of the American Association, playing a series of games in the several cities; that on Sunday, May 23, 1909, he participated, as the first baseman of the Indianapolis club, in a game played with one of the other clubs of the association on grounds maintained by the Indianapolis club in the city of Indianapolis, known as Washington Park; that the game was played between the hours of 3 o'clock and 5 o'clock in the afternoon of that day, and that there was no church nor hospital within one thousand feet of the grounds, or park, where the game was played.

Appellant was convicted on the theory that so much of the act set out as undertakes to exempt persons whose

usual vocation is playing baseball for hire, and who follow such vocation on Sunday under the restrictions named in the act, is in violation of article 1, §23, of the state Constitution which provides that "the General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." On that theory the State is depending to sustain the conviction. Other questions raised and discussed flow from this one question, and the need of considering them depends on the decision of the question of the validity of the exemption of baseball playing from the general effect of the act.

In the very able brief of the counsel for the State it is conceded that it is for the legislative department of the state government to declare the public policy of the 2. State; and as to all offenses against the State—that is, all questions of crime—what shall be the policy of the State is within the exclusive power of the legislature. In other words, that the legislature alone can create or define offenses against the State for which individuals may be punished, that none exist except such as have been so created and defined, and that therefore courts cannot inflict any penalty for an act which the legislature has not declared to be a crime, however immoral the members of the court may conceive it to be. Counsel in further concession said: " Unquestionably the State, in the exercise of its police power, may determine on the grounds of morality, or from sociological consideration, that there should be a cessation from all the usual labors of life on one day in each week. And therefore, unquestionably, the legislature was acting in its province when it enacted the body of the section forbidding all persons save those excepted from following their usual vocations. And unquestionably it would be within the power of the legislature, as a mere abstract proposition, to repeal this and all other similar enactments altogether, and leave no enactment whatever in force forbidding labor

of any kind or pursuits of any kind on Sunday. We are not disputing this question. And further than this, we admit that the legislature may pass a general law forbidding men generally from following their usual vocations on Sunday, and that then they may except or exempt certain vocations from the operation of the law." All this is manifestly true and well conceded.

Counsel for the State also well say: "We are also mindful that when any party to a cause, whether it is the State itself or the humblest citizen, challenges the validity or constitutionality of any act of the General Assembly of the State, it must stand ready to point out and put its finger on the provision of the Constitution that it is claimed is violated." While this states correctly the obligation resting on one assailing the validity of a law, it does not fully measure the duty resting on a court in considering and determining the question presented. The power given to courts to overthrow an act of the legislature is the highest and most solemn function with which they are vested, and it is to be exercised only under the compulsion of the clearest and most positive conviction that some constitutional provision has been violated by the lawmaking body in the enactment of the law assailed. Article 4, §1, of our Constitution vests in the General Assembly the lawmaking power of the State, and that body is supreme and sovereign in the exercise of the power, subject only to such limitations as are imposed, expressly or by clear implication, by the state Constitution and the restraints of the federal Constitution and the laws and treaties passed and made pursuant to it. Apart from these curtailments of power, the legislature is without fetter or clog, especially when exercising its police power. State, ex rel., v. Menaugh (1898), 151 Ind. 260, 43 L. R. A. 408, and cases cited; State, ex rel., v. Fox (1902), 158 Ind. 126, 56 L. R. A. 893; Cain v. Allen (1907), 168 Ind. 8.

The duty of this court in considering a question as to the

validity of a legislative enactment was well defined in part in the following language in the case of *State, ex rel.,* v. *Menaugh, supra:* " Being therefore required to give the benefit of all reasonable doubts in favor of the validity of the act of the lawmaking power, it is consequently incumbent upon him who assails its validity to establish affirmatively and clearly his charge to the exclusion of all such doubts. Especially must this rule prevail in view of the fact that the legislature is invested with plenary power for all purposes of civil government. Therefore an inhibition to exercise a particular power is an exception, and the burden must rest upon the party who questions the validity of a statute to show that it is forbidden. *Jamieson* v. *Indiana, etc., Gas Co.* [1891], 128 Ind. 555, 12 L. R. A. 652, and cases cited; *State, ex rel.,* v. *McClelland* [1894], 138 Ind. 395; Cooley, Const. Lim. 105." It is said in the case of *Henderson* v. *State, ex rel.* (1894), 137 Ind. 552, 556, 24 L. R. A. 469, that " to doubt the constitutionality of a law, is to resolve in favor of its validity. An act of the legislature is not to be declared unconstitutional unless it is clearly, palpably and plainly in conflict with the Constitution." See *State, ex rel.,* v. *McClelland* (1894), 138 Ind. 395; *State* v. *Gerhardt* (1896), 145 Ind. 439, 33 L. R. A. 313; *Townsend* v. *State* (1897), 147 Ind. 624, 37 L. R. A. 294, 62 Am. St. 477.

The following statement of the duties and responsibilities of the courts in relation to enactments by the legislature, by Frazier, J., in the case of *Brown* v. *Buzan* (1865), 24 Ind. 194, 196, is as wise and pertinent now as it was then: "The Constitution is paramount to any statute, and whenever the two are in conflict the latter must be held void. But where it is not clear that such conflict exists, the court must not undertake to annul the statute. This rule is well settled, and it is founded in unquestionable wisdom. The apprehension sometimes, though rarely, expressed, that this rule is vicious, and constantly tends toward the destruction of popular liberty, by gradually destroying the constitu-

tional limitations of legislative power, results from a failure to comprehend the character of our forms of government, and the fundamental basis upon which they rest. The legislature is peculiarly under the control of the popular will. It is liable to be changed, at short intervals, by elections. Its errors can, therefore, be quickly cured. The courts are more remote from the reach of the people. If we, by following our doubts, in the absence of clear convictions, shall abridge the just authority of the legislature, there is no remedy for six years. Thus, to whatever extent this court might err, in denying the rightful authority of the lawmaking department, we would chain that authority, for a long period, at our feet. It is better and safer, therefore, that the judiciary, if err it must, should not err in that direction. If either department of the government may slightly overstep the limits of its constitutional powers, it should be that one whose official life shall soonest end. It has the least motive to usurp power not given, and the people can sooner relieve themselves of its mistakes. Herein is a sufficient reason that the courts should never strike down a statute, unless its conflict with the Constitution is clear. Then, too, the judiciary ought to accord to the legislature as much purity of purpose as it would claim for itself; as honest a desire to obey the Constitution, and, also, a high capacity to judge of its meaning. Hence, its action is entitled to a respect which should beget caution in attempting to set it aside. This, with that corresponding caution of the legislature, in the exercise of doubtful powers, which the oath of office naturally excites in conscientious men, would render the judicial sentence of nullity upon legislative action as rare a thing as it ought to be, and secure that harmonious coöperation of the two departments, and that independence of both, which are essential to good government.''

With a full realization of the limitations upon the power of the court and the grave duties resting upon it, as well as

a serious appreciation of the importance of this case, 4. which involves a modification of the Sunday law of our State as it has heretofore existed, which is unique, we approach the consideration of questions presented for decision.

There have been Sunday laws in our State throughout its history. Such an act was passed at the session of the first General Assembly, and was approved January 3, 1817 (Acts 1816 p. 165). This act contained numerous exceptions to the general application of the penalty · provided, and it continued in force without substantial change until 1905, when the legislature added to the exceptions, by the provision that it should not apply to " persons engaged in the publication and distribution of news." As has been seen, the act of 1909, *supra,* merely added the further exception of baseball playing under certain conditions, which exception is assailed as invalid in this case. Many times the law has been upheld by this court, together with all the exceptions contained in it, save the two just mentioned. *Voglesong* v. *State* (1857), 9 Ind. 112; *Foltz* v. *State* (1870), 33 Ind. 215; *Johns* v. *State* (1881), 78 Ind. 332, 41 Am. Rep. 577.

There probably has never been enacted a law for Sunday observance that was wholly general and without exception. Some prohibit generally all vocations of life, and except generally from the operation of the law, and save from its penalty, work in any vocation which may be determined as a matter of fact to be done in response to a present necessity or to charity. Others go further, and except some one or more designated businesses or vocations, the continuous exercise of which may be deemed necessary, either on account of the inherent nature of the business or the welfare of the public. Others again place the ban of the prohibitive statute on some one or more businesses or vocations of a noisy character, or otherwise offensive and disturbing to the full and peaceful enjoyment of the day as a period of rest or recuperation, or of devotion, as each individual may

please to keep it, leaving all other employments to be pursued or dropped according to the individual choice. The exception from the operation of such laws of those who, from religious conviction, observe another day as their Sabbath, is common.

Sunday laws, with varying exemptions from their general effect, within the range stated, have been uniformly held to be within the constitutional powers of lawmaking bodies.

In the case of *Liberman* v. *State* (1889), 26 Neb. 464, 42 N. W. 419, 18 Am. St. 791, a city ordinance that made it unlawful for any business house, bank, store, saloon or any office to keep open on Sunday for general business, but excepted telegraph, railroad, telephone and express offices, photograph galleries, hotels, restaurants, cigar stores, ice-cream parlors, fruit stands, meat markets, bathrooms, establishments for the printing and distribution of newspapers, and other businesses and vocations, was held to be valid, and the classification, permissible.

In the case of *People, ex rel.*, v. *Hagan* (1901), 73 N. Y. Supp. 564, 36 Misc. 349, it was held that a Sunday observance law permitting the sale of articles of food generally before 10 o'clock in the morning, but prohibiting the sale of " uncooked flesh foods, or meats, fresh or salt," at any time during the day, was well within the police power of the legislature.

From the case of *People, ex rel.*, v. *Zimmerman* (1904), 95 N. Y. Supp. 136, 48 Misc. 203, it appears that there was in force in the State of New York a general Sunday law, and also a law prohibiting " all manner of public selling or offering for sale of any property on Sunday, except that articles of food may be sold and supplied at any time before 10 o'clock in the morning, and except also that  *  *  * prepared tobacco, milk, ice and soda-water,  *  *  *  fruit, flowers, confectionery, newspapers,  *  *  *  may be sold." The " sale or delivery of uncooked flesh foods, or meats, fresh or salt, at any hour or time of the day," was prohibited. The law was upheld.

The case of *State* v. *Nichols* (1902), 28 Wash. 628, 69 Pac. 372, involved the validity of a Sunday law which made it unlawful to " open on Sunday, for the purpose of trade or sale of goods, wares, and merchandise, any shop, store or building, or place of business whatever," but exempted druggists, livery stable keepers and undertakers. It was held that the law was valid, and that it was clearly within the legislative discretion to make said exceptions.

In the case of *State, ex rel.,* v. *Judge* (1887), 39 La. Ann. 132, 139, 1 South. 437, a Sunday law was assailed on the ground that it sought to compel the observance of Sunday as a religious institution, and also on the ground that it was class legislation, because of certain exemptions from its general effect. Its provisions required, under penalty, that " all stores, shops, saloons, and all places of public business * * * and all plantation stores " should close at 12 o'clock Saturday night and remain closed twenty-four hours. It was provided that the act should not apply to newsdealers, keepers of soda fountains, places of resort for recreation and health, watering places and public parks, places where ice was sold, newspaper offices, printing offices, book stores, drug stores, bakeries and other named businesses. The court held, and such holding is in accordance with what is almost the unanimous opinion of courts in decided cases and of eminent jurists in textbooks, that if the object of the act were to compel the observance of Sunday as a religious institution, because it is the Christian Sabbath, to be kept holy under the ordinances of the Christian religion, it would be compelled to declare it violative of the Constitution. It was declared that the statute was to be judged precisely as if it had selected any other day of the seven as a day of rest, and that its validity was not to be questioned because, in the exercise of a wise discretion, that day had been chosen which a majority of the people, under the sanction of their religious faith, already voluntarily observed as their day of rest. On the question of the effect of the exceptions on the

validity of the act, the court said: "It only remains to consider the objection urged against the law on the ground of inequality, because of the numerous exceptions contained in the act. The objection has not the slightest force. The law is not unequal in any constitutional sense. No person in the state is permitted to pursue any of the prohibited callings on Sunday; every person is at liberty to pursue those which are excepted. The same discretion which authorized the legislature to determine that the public health, welfare, and convenience required the adoption of the general rule, equally authorized it to exempt from its operation certain specified callings, on the ground that the public welfare and convenience would be more hindered than advanced by the suspension of such callings. It is not for us to control the lawmaking power in such a case, or to require it to fit its laws to a Procrustean bed of our own construction."

The constitutionality of a Sunday law, with numerous exceptions, was involved in the case of *State* v. *Dolan* (1907), 13 Idaho 693, 92 Pac. 995, 14 L. R. A. (N S.) 1259. The act in its general provisions made it unlawful for any person to keep open on Sunday any shop, store, building or place of business whatever for the purpose of any business, trade, or sale of goods, wares or merchandise. It was further provided that the law should not apply to news stands for the sale of daily papers and magazines, nor to the sale of nonintoxicating refreshments, candies and cigars, nor to the carrying on of certain other named businesses and vocations. As against a contention that the law was in conflict with the constitutional provisions against unreasonable discriminatory classification, the court said: "An examination of the authorities, however, supports the contention that the legislature is the sole judge of the exemptions that may be made from the operation of such a statute; that the question of determining what classes of business shall be exempt from a Sunday closing law, is a matter of policy and entirely within the power of the legislature, and that the judicial department

will not call in question the motive of the legislative department in enacting a statute."

A statute of the State of Utah prohibited, in general, the keeping open on Sunday of any place of business for the purpose of transacting business therein, but also excepted from the general operation thereof, public baths, livery stables, retail drug stores, etc., and such manufacturing establishments as are usually kept in constant operation. In dealing with the contention urged on behalf of a barber who was being prosecuted under the general provisions of the act, that the exceptions made the act unjustly discriminative and rendered it invalid, the court said: " The exception permitting baths to be kept open on Sunday approaches nearest to the act here complained of; but the court is unable to say that there is such a similarity between keeping open a bath house and a barber shop that it was not within the province of the legislature to make a distinction between the two. Upon reflection, many points of difference in the manner in which each is conducted in this community are readily suggested. The court may not rightly assert a wisdom it would deny to the coördinate branch of government (the legislature), and interfere with the discretion of that department of government. All presumptions are in favor of the validity of a statute, and unless the courts can clearly say that the legislature has erred the act should stand, and the prerogatives of the legislature not be encroached upon. Courts may interpret, construe, declare and apply the law, but may not usurp the functions of the lawmaking power by assuming to interfere with or control the legislative discretion." *State* v. *Sopher* (1902), 25 Utah 318, 71 Pac. 482, 95 Am. St. 845, 60 L. R. A. 468.

A statute of the State of Minnesota placed a general prohibition on all manner of selling or offering for sale on Sunday any property, and then excepted from its general provisions prepared tobacco, fruits, confectionery, newspapers, and other articles, and then followed this exemption with a

proviso " that nothing in this section shall be construed to
allow or permit the public sale of uncooked meats, fresh or
salt, or groceries, dry goods, clothing, wearing apparel of
any kind, or boots or shoes." It was contended that the
statute involved and authorized a discrimination for favored
classes in the exemption of fruit, confectionery and news-
paper selling, and against meat dealers especially, so palpably
unreasonable as to convict the legislature of gross and arbi-
trary partiality in its adoption; but the court held that the
selection of the classes for the ban of the law and the exemp-
tion therefrom was for the legislature, saying, that " whether
the discrimination be justified by wise legislative policy, we
are not required to determine. That is the province of the
lawmaking power, not ours. It is our duty to ascertain,
if possible, whether, from our knowledge of existing condi-
tions, there is such a sensible distinction between these
occupations as would furnish a basis of judgment in making
the same." Upon such consideration the court concluded
that there were differences upon which the legislature might
have acted in the exercising of a reasonable judgment. *State,
ex rel.*, v. *Justus* (1904), 91 Minn. 447, 98 N. W. 325, 64
L. R. A. 510, 103 Am. St. 521.

In the case of *Ex parte Koser* (1882), 60 Cal. 177, in hold-
ing good a Sunday statute prohibiting generally the conduct-
ing of business on Sunday, and excluding some from the
general provisions, it was said that the questions of exemption
and what should be excluded, were for the legislature. We
quote the following from the opinion: "Certainly, the legis-
lature is intrusted with an enlarged discretion to determine
what shall be punished criminally and what shall not be, to
fix upon what shall be put in the class of *mala prohibita,* and
what shall not be included. * * * Declaring the pro-
visions of the sections referred to invalid as violative of the
constitution, would be to strike at the foundation of the
legislative power to determine what acts, of those not *mala
in se,* shall be punished criminally, and what shall not be

punished. In most cases acts not *mala in se* are by statute declared penal offenses, while other acts, apparently of a like nature, are not declared to be penal. What other power than the legislature can or should draw the line, on one side of which is liability to punishment, and on the other side no such liability is incurred."

In the case of *People* v. *Havnor* (1896), 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. 707, a law prohibiting barbers generally throughout the state from carrying on their business on Sunday, but providing that barbers in the city of New York and the village of Saratoga Springs might conduct such business until 1 o'clock of the afternoon of that day, was held to be a valid exercise of the police power by the legislature, and that the exception was not so obviously arbitrary as to nullify the provision.

In the case of *Petit* v. *Minnesota* (1900), 177 U. S. 164, 20 Sup. Ct. 666, 44 L. Ed. 716, a Sunday law of the State of Minnesota excepted from its general operation works of charity and necessity, and then specially provided that the keeping open of a barber shop on Sunday for work should not be deemed a work of necessity. It was contended both in the Supreme Court of Minnesota and the Supreme Court of the United States that, by reason of the proviso, the act must be held unconstitutional, because thereby it was restricted in its operation on the particular class of craftsmen to which Petit, the defendant, belonged, as contradistinguished from other classes of labor. The Supreme Court of the United States, following that of the state, held that the classification was not purely arbitrary, and said in conclusion: "We recognize the force of the distinctions suggested and perceive no adequate ground for interfering with the wide discretion confessedly necessarily exercised by the states in these matters, by holding that the classification was so palpably arbitrary as to bring the law into conflict with the federal Constitution."

This review of the cases involving the right of the lawmak-

ing department of states to make classification of what should
or should not be prohibited on Sunday, and what should be
declared criminal if done on that day, might be largely ex-
tended, but to no good purpose. These cases are reviewed at
this length, not in admission that this court, in every instance,
approves the conclusion reached or the reasoning by which it
was reached, nor that they are precedents of such strength
and manifest correctness as to coerce this court in the de-
cision of the question before it; but they are all illustrative
of the fact that a legislature has the constitutional power to
make selection at least of those things not inherently wrong
and not involving moral turpitude, and to place the ban of
the law upon them.

The exercise of the power of the legislature to make excep-
tions from the general effect of a penal statute is seen in
many of the provisions of our criminal code affecting various
things, persons and conditions. The act for the protection of
fish, approved March 9, 1867 (Acts 1867 p. 128), was a gen-
eral law for the protection of fish throughout the State for a
certain number of years and at certain seasons thereafter, but
it provided that the penalties prescribed should not be en-
forced against persons taking fish out of the Ohio and the
St. Joseph rivers. This court held that both the act and the
exception were valid. *Gentile* v. *State* (1868), 29 Ind. 409.

A later case, which involved the validity of our fish law, is
that of *Long* v. *State* (1910), *ante* 17. Long was convicted of
taking fish from the Wabash river with a seine, in violation
of §2541 Burns 1908, Acts 1905 p. 584, §619, and on appeal
urged that the section in question was unconstitutional, be-
cause in violation of article 4, §22, of the Constitution, which
prohibits the passage of local laws for the punishment of
crime, and of article 1, §23, of the Constitution, against
granting special privileges and immunities. Section 2541,
*supra*, makes it unlawful to take fish from any of the
waters of the State by means of any gig, spear, seine, net
or trap, etc., under a heavy penalty, but contains a proviso

that its provisions shall not apply to the waters of Lake Michigan, private ponds, the Ohio river, or the Wabash river, but making only a partial exemption of these two rivers. The court by Montgomery, J., in passing on these questions, said: " If it be conceded that the act provides for punishment for crimes and misdemeanors within the meaning of the constitutional provision cited, it does not follow that it is local and invalid. Article 4, §22, of the Constitution does not preclude proper classification in legislation relating to the subjects therein enumerated, but does prohibit legislation which rests upon such arbitrary selection as renders the act local or special. Many of our penal statutes have exclusive application to special localities or objects, and are nevertheless general and unquestionably valid, because they rest upon an inherent and substantial basis of classification. * * * The line defining the precise limits of classes must, in most cases, be in a sense arbitrary. The legislature had full power over the subject-matter of this legislation, and in making the exceptions contained in the act there is no evidence of bad faith or purely arbitrary action. * * * It is our conclusion, therefore, that the statute does not contravene article 4, §22, of the Constitution. * * * The only reason advanced in support of the other constitutional objection raised is that the act confers privileges on citizens residing near the Wabash river where it forms a state boundary which are not allowed to citizens residing near the same stream where it is wholly within the State. This scarcely requires discussion, since it is manifest that a few persons necessarily share more largely than others the benefits of every general law, by reason of their special situation. This act does not confer privileges or immunities upon any citizens, but such fishing privileges as are not prohibited are available to all citizens on the same terms."

Section 449 of the public offenses act (Acts 1905 p. 584, §2345 Burns 1908) makes it unlawful for all persons except travelers to wear or to carry any dirk, pistol, bowie-

knife, dagger, sword in cane or any other dangerous or deadly weapon. One would have to consider earnestly to evolve any especially good reason, in our day and the condition of society, that would make it needful for a traveler to carry a weapon, contrary to the general inhibition, that would not apply with equal force to many persons not travelers, but the law in its entirety has long been upheld, and as lately as within two years. See *McIntyre* v. *State* (1908), 170 Ind. 163.

In the case of *Johns* v. *State* (1881), 78 Ind. 332, 41 Am. Rep. 577, this court sustained the validity of our Sunday law, and especially the exception from the general operation of the law of those who conscientiously observe the seventh day of the week as the Sabbath. In the opinion of the court, given by Elliott, J., it was said: "The opinion in *Fry* v. *State* [1878], 63 Ind. 552, 30 Am. Rep. 238, vindicates the constitutionality of the statute we are discussing. It was there held that it is competent for the legislature to restrict the sale of railway tickets to persons who have complied with certain prescribed terms, and to punish persons selling tickets who had not complied with the requirements of the law. As was there said by Howk, C. J., as the organ of the court: 'It is neither the province nor the duty of the courts to call in question either the policy or the wisdom of any act of legislation.'"

Our statute relating to the practice of medicine, which provides for licenses and declares penalties for violations, makes certain exemptions from the general application of the penal provisions. §8400 *et seq.* Burns 1908. This court in *Parks* v. *State* (1902), 159 Ind. 211, 59 L. R. A. 190, held it to be constitutional and not in conflict with the "privileges and immunities" clause of the federal Constitution or of our Constitution. It was there said: "As the power to enact laws has been confided to the legislative department, a very large measure of authority is vested in that department to determine what is reasonable and wholesome in the en-

actment of statutes under the police power. * * * In the exercise of the police power there must needs be a considerable discretion vested in the legislature, whereby some people have rights or suffer burdens that others do not." And again it was said in the same opinion: "The power of reasonable classification, however, exists (*Missouri* v. *Lewis* [1879], 101 U. S. 22, 31, 25 L. Ed. 989; *Barbier* v. *Connolly* [1885], 113 U. S. 27, 5 Sup. Ct. 357, 28 L. Ed. 923; *Hayes* v. *Missouri* [1887], 120 U. S. 68, 71, 7 Sup. Ct. 350, 30 L. Ed. 578), and in cases where there is room for the presumption that a substantial and just reason furnished the basis for legislation enacted in the carrying out of a public purpose, the exercise of the legislative discretion, in the establishing of a classification, must be respected by the courts. *Holden* v. *Hardy* [1898], 169 U. S. 366, 18 Sup. Ct. 383, 42 L. Ed. 780."

The case of *Chandler Coal Co.* v. *Sams* (1908), 170 Ind. 623, settled affirmatively the validity of an act of this State for the protection of miners, which was general in its scope but contained exceptions that removed certain mines from its requirements. The court held the classification permissible, approving this statement: " ' Of course, the legislature must have the power to classify, when necessary, subjects for legislation, and make provisions for subjects within one class, without making them applicable to subjects in another; and the proper exercise of that power is not liable to the objection that it is class legislation.' [*Lavalle* v. *St. Paul, etc., R. Co.* (1889), 40 Minn. 249, 49 N. W. 974.] It follows, and we so conclude, that neither of the exceptions in controversy violates any principle of constitutional law, either state of federal."

Another late case decided by this court, which involved a contention that a penal law, which was enacted for the protection of miners but which excepted certain mines from the general operation of the law, was invalid, is that of *State* v. *Barrett* (1909), 172 Ind. 169. In holding both the act and

the exception constitutional and a just exercise of the police power, this court said on page 179: "The legislature had the right, and we must presume, exercised it, of learning for itself the reasons which impelled it to act, and we cannot say that it did not find substantial reasons for its conclusions. Unless we can say that the act is unreasonable, we would not be authorized to overthrow it, for a very large measure of authority is vested in the legislature upon that subject."

In the case of *Griffith* v. *Connecticut* (1910), 218 U. S. 563, 54 L. Ed. 1151, 31 Sup. Ct. 132, it is disclosed that a statute of Connecticut made it unlawful, with severe penalty, for any person, firm or corporation to exact more than fifteen per cent interest for money loaned. National banks and banks and trust companies of that state and pawnbrokers were excepted from the general effect of the law, and this was made the ground for the contention that it was invalid. It was held, sustaining the supreme court of the state, that the general assembly, in respect to the matter of usury, had the right to deal with different classes of money lenders and money borrowers in a different way, provided there was nothing apparently unreasonable in creating such distinctions, and all members of each class were treated alike.

It cannot be otherwise than that the lawmaking department has the power, in legislating for the general welfare, to make reasonable exceptions to the general operation and effect of penal laws in certain instances, without conflicting with the constitutional limitations placed upon its action. It is a high power, a governmental power of the very highest nature. Within what limits must that department keep to avoid the power of the judicial department to nullify its action? This court has decided many times that courts have nothing to do with the wisdom, justice, policy or expediency of a law; that these questions are for the legislature.

The legislature is unfettered save by constitutional re-

straints. The police power is not a fixed or known quantity, but the expression of social, economic and political 5. conditions. As these conditions vary, the police power must continue to be elastic and capable of development to meet these changes. Freund, Police Power §3. That it might have been proper and perhaps necessary in the early history of our State for a traveler to carry with him on his journey a deadly weapon seems evident; but changed conditions in the increase of population, means of travel and otherwise would seem to make it much less clear that the traveler should be excepted from the law against carrying weapons. In the early days, when life was lived more in the open, when employments were less confining, less monotonous, and when the stress of life and spur of competition did not so drive to continuous toil, when the amusements of life were few and simple, we can see that the Sunday law then might reasonably have been different from the present in its restraints. The police power is that inherent and plenary power residing, within constitutional limitations, in the legislature to pass wholesome and reasonable laws for the good and welfare of the people of the State. Sunday 6. laws, which are an invasion of natural private right, are enacted under this power. They are upheld as sanitary measures, on the ground of necessity for periodical relaxation and rest from mental and physical toil, for the general good. The influence of the Christian religion we know has been potent in establishing our civil Sunday, and it is probably true that the desire to give free opportunity for religious devotion and observance of the day as a Christian institution was not absent from the mind and intent of the lawmaking power in providing for and requiring fulfilment of the day as a day of pause in the activities of life. And we know also that without the influence of the Christian religion and its followers and believers the enforcement of observance of the day as a civil day of rest and recuperation would be difficult indeed and its integrity hardly preserved. But emi-

nent jurists and courts, with practical unanimity, agree that Sunday laws can only be upheld as a civil regulation of a sanitary nature. Freund, Police Power §185; Tiedeman, Police Power §76; Cooley, Const. Lim. (7th ed.) 675; *Hennington* v. *Georgia* (1896), 163 U. S. 299, 16 Sup. Ct. 1086, 41 L. Ed. 166. Such laws may be said to be based on the saying of the Master: " The Sabbath was made for man and not man for the Sabbath." Indeed it is true, for the idea is to work a recuperative benefit primarily to the individual, that good may follow to society at large.

It will appear by examination of the exceptions in Sunday laws that they are sometimes made for the benefit of the business or vocation exempted, sometimes for the benefit of those patronizing the business or vocation exempted, sometimes for the benefit of both, and again for the benefit of society generally.

If the act in question and the circumstances connected with it were such that in considering the exemption of ball playing from the general provision against Sunday work we must say that it is patent that the legislature intended solely to give baseball players an advantage over those pursuing other vocations, or that it intended to place it in the power of those employing baseball players to force them to pursue their calling seven days in the week, then we would be required to hold the action of the legislature in passing it to be purely arbitrary, and the act therefore in conflict with the constitutional restraints upon the legislature. But we cannot do this, for there are manifest conditions and reasons existing upon which the legislature might have acted, which they in the exercise of their discretion might have deemed full warrant for making the exemption.

The purpose of the required observance of Sunday as a day of cessation of the daily vocations of the people, being based on sanitary reasons, it is obvious that the purpose in all cases could not best be carried out by the inertia of absolute rest. The wearing effects of the monotony of daily toil in office,

store, factory, or wherever the lot of man is cast to labor, are overcome by diversion of mind no less than by the mere respite from the physical or mental strain.

That baseball has come to be the one great American outdoor game, that it is played during the summer season throughout the land by boy, youth and man, beginner, amateur and professional, in country, village, town and city, that it is played out of doors in seasonable weather, that it engages the mind alike of the participant and the spectator in an entertaining way, that it trains the body to vigor and activity and, to a degree, the mind to alertness, that the playing of a game requires but a fraction of a half-day, that it cannot be successfully played at night, that those who witness it find in it for the time a relief mentally and physically from the stress of the intense life we as a people lead—are facts known to all men, and of which courts and legislatures cannot be wholly ignorant. And we cannot say that the legislature did not have in mind that good might flow to many, who during all the secular days of the week might be compelled to persist in continuous toil in office, store, shop or factory. By spending a part of the afternoon of Sunday in the open air their minds might be diverted by interest in the popular game. And too, it is well and commonly known that the season for baseball, both on account of the nature of the game and the actual practice, is short, that the hours of each day devoted to its pursuit by the players engaged in it are few, and that weather conditions enforce frequent pauses; and it cannot be said that the legislature did not conclude, as it might, that the welfare of players, therefore, needed no such restriction on their natural right to pursue their work on each of the seven days of the week as might be necessary in other employments.

The legislature may, admittedly, withdraw a class from the general anathema of the Sunday law, for the purpose of a severer penalty, not for the good or relief of those

7. constituting that class which would be involved in a cessation of their labor on that day, but for such

good as might come therefrom to others of the community from added peace or quiet or other reason. *State* v. *Hogreiver* (1899), 152 Ind. 652, 45 L. R. A. 504.

It would seem to follow then that it has the correlative power to withdraw a class from inclusion in the inhibition of Sunday labor for the good of others, if reason manifestly exists upon which the legislative action may be based. It being conceded that baseball playing in its nature is subject to classification by itself in legislation having reference to Sunday observance, its classification becomes then a legislative question and not a judicial one. Whether it shall be subjected to such legislation, or in what degree, and under what circumstances and restrictions, is for the legislature to say, within the reasonable exercise of its discretion which ends only where arbitrary action begins.

A reason of such a character as to indicate an absence of purely arbitrary action, upon which the legislature might have been moved to act in exempting ball playing from the penalty of the act in question, is manifest. As much as we, as individuals, may desire the integrity of the Sabbath preserved in full measure, we cannot say that the legislature acted arbitrarily in making this exemption, or that it is clearly, palpably and plainly in conflict with that provision of the Constitution claimed, and we therefore hold that it is a valid enactment.

The judgment is therefore reversed, with instructions to the trial court to sustain the motion of appellant in arrest of judgment.

## DISSENTING OPINION.

MYERS, C. J.—I am unable to concur in the majority opinion in this case.

The amended §467 together with the amendment to §468 (Acts 1909 p. 436) specifically singles out the game of baseball from football and other games, and exempts the former from the general interdiction. This is in

direct contravention of article 1, §23, of the Constitution, with respect to the equal rights and privileges of the players of every other kind of game, where a fee is charged, in allowing baseball to be played and a fee to be charged. This proposition is fully sustained by the following authorities: *Indianapolis Traction, etc., Co.* v. *Kinney* (1909), 171 Ind. 612, 23 L. R. A. (N. S.) 711; *Bedford Quarries Co.* v. *Bough* (1907), 168 Ind. 671, 14 L. R. A. (N. S.) 418; *Town of Longview* v. *City of Crawfordsville* (1905), 164 Ind. 117, 68 L. R. A. 622; *Sellers* v. *Hayes* (1904), 163 Ind. 422; *School City of Rushville* v. *Hayes* (1904), 162 Ind. 193; *Dixon* v. *Poe* (1902), 159 Ind. 492, 60 L. R. A. 308, 95 Am. St. 309; *Henderson* v. *London, etc., Ins. Co.* (1893), 135 Ind. 23, 20 L. R. A. 827, 41 Am. St. 410; *Graffty* v. *City of Rushville* (1886), 107 Ind. 502, 57 Am. Rep. 128; *Connolly* v. *Union Sewer Pipe Co.* (1902), 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679; *Cotting* v. *Kansas City Stock-Yards Co.* (1901), 183 U. S. 79, 22 Sup. Ct. 30, 46 L. Ed. 92; *Brown* v. *Russell* (1896), 166 Mass. 14, 43 N. E. 1005, 32 L. R. A. 253, 55 Am. St. 357; *Noel* v. *People* (1900), 187 Ill. 587, 58 N. E. 616, 52 L. R. A. 287, 79 Am. St. 238; *Ruhstrat* v. *People* (1900), 185 Ill. 133, 57 N. E. 41, 49 L. R. A. 181, 76 Am. St. 30; *City of Carrollton* v. *Bazzette* (1896), 159 Ill. 284, 42 N. E. 837, 31 L. R. A. 522; *State* v. *Garbroski* (1900), 111 Iowa 496, 82 N. W. 959, 56 L. R. A. 570, 82 Am. St. 524; *People* v. *Havnor* (1896), 149 N. Y. 195, 43 N. E. 541, 31 L. R. A. 689, 52 Am. St. 707; *In re Keymer* (1896), 148 N. Y. 219, 42 N. E. 667, 35 L. R. A. 447; *People* v. *Gillson* (1888), 109 N. Y. 389, 17 N. E. 343, 4 Am. St. 465; *Ex parte Newman* (1858), 9 Cal. 502; *Murray* v. *Board, etc.* (1900), 81 Minn. 359, 84 N. W. 103, 51 L. R. A. 828, 83 Am. St. 379; *State, ex rel.,* v. *Wagener* (1897), 69 Minn. 206, 72 N. W. 67, 38 L. R. A. 677, 65 Am. St. 565; *Johnson* v. *St. Paul, etc., R. Co.* (1890), 43 Minn. 222, 45 N. W. 156, 8 L. R. A. 419; *State* v. *Gardner* (1898), 58 Ohio St. 599, 51 N. E. 136, 41 L. R. A. 689, 65 Am. St. 785; *Sutton* v. *State* (1896), 96 Tenn. 696, 36 S. W.

697, 33 L. R. A. 589; *Sayre Borough* v. *Phillips* (1892), 148 Pa. St. 482, 24 Atl. 76, 33 Am. St. 842, 16 L. R. A. 49; *State, ex rel.,* v. *Ashbrook* (1900), 154 Mo. 375, 55 S. W. 627, 77 Am. St. 765, 48 L. R. A. 265; *Waters-Pierce Oil Co.* v. *City of Hot Springs* (1908), 85 Ark. 509, 109 S. W. 293, 16 L. R. A. (N. S.) 1035; *Milton* v. *Bangor R., etc., Co.* (1907), 103 Me. 218, 68 Atl. 826, 15 L. R. A. (N. S.) 203, 125 Am. St. 293; *State* v. *Schmuck* (1900), 77 Ohio St. 438, 83 N. E. 797, 14 L. R. A. (N. S.) 1128, 122 Am. St. 527; *State* v. *Holland* (1908), 37 Mont. 393, 96 Pac. 719; *In re Van Horne* (1908), 74 N. J. Eq. 600, 70 Atl. 986.

For the same reason it is a special law, in violation of article 4, §22, of the Constitution prohibiting the enactment of local or special laws for the punishment of crimes or misdemeanors.

It is tantamount to saying that it shall be unlawful, not upon religious grounds, but upon grounds of health and recreation, for any person to play any game except baseball, on the forbidden day.

If there could be any ground of distinction between, or classification of, baseball players, as distinct from players of other games, we would be bound to yield to the legislative discretion. If it could be said that it is allowable because it provides recreation for the worn and tired persons, who cannot yield any other day from their work, to witness a game in the daytime, the same thing is true as to football, basketball, polo, cricket, or any other outdoor game, but they are interdicted and excluded from the privilege, and the sightseer, and those who are seeking recreation, are excluded from other games, and a distinction is made as to both, so that those persons who are within the related or same class—that is, all persons desiring to engage in other games as well as those who may desire to witness them—are denied the privilege where a fee is charged.

I am unable to perceive that there can possibly be any basis for such distinction or ground upon which the classifi-

cation can rest.   There is just as much inequality produced by singling out baseball players and permitting them to play for compensation, while all other games for pay are prohibited, as there was in singling out barbers and punishing them. *Armstrong* v. *State* (1908), 170 Ind. 188, 15 L. R. A. (N. S.) 646.

The classification is openly and frankly made, as is shown by the repealing clause of the second section, leaving no doubt as to the purpose intended.   A classification in which all within the class, or naturally related to it, are not embraced, cannot be justified.   *Indianapolis Traction, etc., Co.* v. *Kinney, supra; Bedford Quarries Co.* v. *Bough, supra; Town of Longview* v. *City of Crawfordsville, supra; Dixon* v. *Poe, supra.*

It is also invalid as a local law, in violation of article 4, §22, of the Constitution.   The last clause of the act permits the game to be played " not less than one thousand feet distant from any established house of worship or permanent church structure used for religious services, or any public hospital or private hospital erected prior to the passage of this act."   The clause specifically interdicts playing within one thousand feet of established houses of worship, or permanent church structures, or public or private hospitals, " *erected prior to the passage of this act.*"   (Our italics.) By its terms, therefore, the game may be played within any distance of such structures erected after the passage of the act, and thus it would be unlawful to play within one thousand feet of these structures if erected prior to the passage of the act, but lawful to play within any distance of those erected later, by reason of which conditions the law would necessarily be local and in violation of said section twenty-two.   These provisions of the Constitution were adopted by the people as restraints upon legislative power, and a correct construction should be courageously adopted by the courts to effectuate the intent of the people as expressed in the organic law, for by erroneous interpretations of its provisions, and by erroneous applications of the doctrine of classification,

its provisions may be gradually abrogated, and the Constitution nullified.

No doubtful case should give rise to annulment of a statute as the deliberate act of a coördinate and independent branch of government, but, by attempted classification, and by laws of only local application, to which there is the most natural tendency, and by extension by construction, in deference to class interest and special cases, the organic law may practically be nullified, until we are in danger of having all the train of evils resulting from local or special legislation, and inequalities of rights, which it was a leading purpose of the Constitution of 1851 to prevent.

Monks, J., concurs in this opinion.